Abdul SALAAM, et al.

v.

George COLLINS, etc.

James CALHOUN–EL,

v.

Bishop L. ROBINSON, et al.

Calvin ROBINSON–BEY

v.

Bishop L. ROBINSON, et al.

Civ. Nos. K–76–1676, K–89–547 and K–89–548.

United States District Court,
D. Maryland.

July 12, 1993.

James D. Wright and Venable, Baetjer & Howard, Baltimore, MD, for plaintiffs.

J. Joseph Curran, Jr., Atty. Gen. of MD, Stephanie J. Lane–Weber and Amy Kushner–Kline, Asst. Attys. Gen., for defendants.

FRANK A. KAUFMAN, Senior District Judge.

Plaintiffs Calhoun–El and Robinson–Bey, inmates at the Maryland Penitentiary, are members of the Moorish Science Temple, an Islamic religious sect. Plaintiffs are also the class representatives in *Salaam v. Collins*, K–76–1676, which originated as a class action brought on behalf of inmates at the Maryland Penitentiary who "practice and follow the Islamic religion." [1] The other two cases are hereby consolidated with *Salaam* pursuant to Federal Civil Rule 42(a).

The issues before this Court at this time concern alleged deprivations of the constitutional rights of class members in three areas: 1) religious diet, 2) the use of space within "A Building", a structure at the Maryland Penitentiary, for Islamic religious services and other functions, and 3) the arrangements

1. Judgment Order in *Salaam* dated October 11, 1979, p. 1.

made concerning the celebration of Founders' Day, a religious holiday of significance for members of the Moorish Science Temple. Defendants have moved for summary judgment as to each and all of plaintiffs' claims related to those issues.

One of the issues in *Salaam* was whether Maryland's Department of Correction should be required to furnish Islamic inmates with meat slaughtered in accordance with Islamic ritual. In his Master's Report and Recommendations, then-Magistrate (now-Judge) Smalkin recommended that plaintiffs' be held not constitutionally entitled to be served a nutritionally adequate pork-free diet with ritually slaughtered meat. The Master's report found that the then-current diet was nutritionally adequate and, because there had been a "reasonable accommodation by the State to the religious needs of the plaintiffs," concluded the diet was constitutionally adequate. The Master's Report was adopted by subsequent Order of Judge Blair of this Court, in 1979.

For a period of time prior to October 1, 1992, the State provided a nutritionally adequate, pork-free diet to all prisoners, but also provided kosher meals to Jewish inmates. Plaintiffs claim that the provision of such a diet to Jews, and the denial of ritually slaughtered meat to them, violated their rights to equal protection under the law and thus initially sought both equitable relief and damages specifically for that alleged violation. However, that quest, insofar as equitable relief is concerned has become moot, since the Department of Correction has amended its prior practice and now provides all inmates with a choice between a pork-free diet containing meat, chicken, and fish and an ovo-lacto-vegetarian diet. Plaintiffs continue to seek damages flowing from the differing treatment of Jews and Moslems during the period preceding the modification of the dietary plan. Further, plaintiffs contend that the currently available two-track diet plan also violates their equal protection rights because, as a practical matter, it permits Christian inmates a choice between two religiously acceptable diets while limiting observant Moslems to the ovo-lacto-vegetarian diet. Plaintiffs seek both equitable relief and damages in connection with that contention.

## LAW

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). Accordingly, "racial segregation, which is unconstitutional outside prisons is unconstitutional within prisons, save for 'the necessities of prison security and discipline.'" *Cruz v. Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) (per curiam) (quoting *Lee v. Washington*, 390 U.S. 333, 334, 88 S.Ct. 994, 994, 19 L.Ed.2d 1212 (1968)). In *Cruz*, a Buddhist inmate filed a section 1983 action claiming discrimination on the basis of religion. In remanding the case for a hearing and "appropriate findings," the Court wrote:

> If Cruz was a Buddhist and if he was denied a reasonable opportunity of pursuing his faith comparable to the opportunity offered fellow prisoners who adhere to conventional religious precepts, then there was palpable discrimination by the State against the Buddhist religion....

*Id.* at 322, 92 S.Ct. at 1081.

> We do not suggest ... that every religious sect or group within a prison—however few in number—must have identical facilities or personnel.... But reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty.

*Id.* at 322 n. 2, 92 S.Ct. at 1081 n. 2.

In 1977, in *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), in which the Supreme Court discussed the applicable standard in prison equal protection cases, prison officials had refused to permit a proposed inmates' union to conduct meetings or to send bulk mailings, while making those opportunities available to the Jaycees and Alcoholics Anonymous. The inmates brought suit alleging, *inter alia*, violation of the Equal Protection Clause. In denying their claim, the Court stated:

It is precisely in matters such as this, the decision as to which of many groups should be allowed to operate within the prison walls, where, confronted with claims based on the Equal Protection Clause, the courts should allow the prison administrators the full latitude of discretion, *unless it can be firmly stated that the two groups are so similar that discretion has been abused.* That is surely not the case here. There is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence.

*Id.* at 136, 97 S.Ct. at 2543 (emphasis added). In both *Cruz* and *Jones,* the Court indicated a willingness to defer to the judgment of prison administrators when the challenged regulations are related to security concerns or to a potential for disruption unless the groups subject to disparate treatment are "so similar" that such disparate treatment amounts to an abuse of discretion.

In its more recent opinions treating prisoners' rights, the Court has enunciated an even more broadly deferential standard for reviewing "prisoners' constitutional claims," a standard which it has characterized as "responsive both to the 'policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights.'" *Turner v. Safley,* 482 U.S. 78, 85, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987) (quoting *Procunier v. Martinez,* 416 U.S. 396, 406, 94 S.Ct. 1800, 1808, 40 L.Ed.2d 224 (1974)). The district court in *Turner* had applied the heightened scrutiny test generally applicable to cases involving alleged violations of equal protection or fundamental rights outside of a prison setting, and the Eighth Circuit had affirmed. *Id.* at 83, 107 S.Ct. at 2258. However, after reviewing four leading prisoners' rights cases decided by the Court in the wake of *Martinez,* Justice O'Connor reversed the Eighth Circuit, noting, "In none of these cases ... did the Court apply a standard of heightened scrutiny, but instead inquired whether a prison regulation that burdens fundamental rights is 'reasonably related' to legitimate penological objectives, or whether it represents an 'exaggerated response' to those concerns." *Tur-*

*ner,* 482 U.S. at 87, 107 S.Ct. at 2260. *Turner* concerned a prohibition, subject to certain limited exceptions, on inmate-to-inmate mail and an almost complete ban on inmate marriages. The inmates claimed a First Amendment right to correspond freely and claimed that the marriage ban unconstitutionally infringed upon the fundamental right to marry. *Turner* apparently did not involve an equal protection claim. The Court concluded that the marriage regulation constituted an "exaggerated response" to perceived institutional concerns. In upholding the limitations on inmate correspondence, however, the Court stated: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if 'prison administrators ... and not the courts, [are] to make the difficult judgments concerning institutional operations.'" *Id.* at 89, 107 S.Ct. at 2261 (quoting *Jones,* 433 U.S. at 128, 97 S.Ct. at 2539).

In *Turner,* the Court set forth several factors courts should consider in determining whether a regulation is reasonably related to penological objectives or whether it should be viewed as an "exaggerated response" to perceived prison administrative concerns:

"(1) whether the regulation has a logical connection to the legitimate government interest invoked to justify it, (2) whether there are alternative means of exercising the rights that remain open to the inmates, (3) the impact that accommodation of the asserted constitutional rights will have on other inmates, guards and prison resources, and (4) the presence or absence of ready alternatives that fully accommodate the prisoners' rights at *de minimis* costs to valid penological interests."

*Kahey v. Jones,* 836 F.2d 948, 950 (5th Cir. 1988).

In *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 353, 107 S.Ct. 2400, 2406, 96 L.Ed.2d 282 (1987), the Court "granted certiorari to ... resolve apparent confusion among the Courts of Appeals on the proper standards to be applied in considering prisoners' free exercise claims." *Id.* at 348, 107 S.Ct. at 2404.

In *O'Lone,* prison administrators had adopted a regulation requiring certain inmates to work outside the prison buildings during the daylight hours. That regulation was applied across the board, based solely on an inmate's security status. The regulation had the effect of depriving Muslim inmates of the opportunity to attend their weekly congregation service, Jumu'ah. The State justified the regulation on the grounds that it alleviated overcrowding within the main building, and assisted the inmates in their progression toward a reduced security status, and asserted that efforts to accommodate Islamic inmates' requests to return to the building for services had caused extreme administrative difficulty. In evaluating the inmates' complaint, Justice O'Connor wrote: "To ensure that courts afford appropriate deference to prison officials, we have determined that prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of constitutional rights." *Id.* at 349, 107 S.Ct. at 2404. After noting alternative ways in which prison officials sought to accommodate Muslim religious requirements and finding that the inmates were not totally deprived of their ability to practice their religion, the Court stated: "[T]he case for the validity of these regulations is strengthened by examination of the impact that accommodation of respondents' asserted right would have on other inmates, on prison personnel, and on allocation of prison resources generally." *Id.* at 352, 107 S.Ct. at 2406. The Court concluded: "We take this opportunity to reaffirm our refusal, even where claims are made under the First Amendment, to 'substitute our judgment on ... difficult and sensitive matters of institutional administration' for the determinations of those charged with the formidable task of running a prison." *Id.* at 353, 107 S.Ct. at 2406 (quoting *Block v. Rutherford,* 468 U.S. 576, 588, 104 S.Ct. 3227, 3233, 82 L.Ed.2d 438).

In a recent pronouncement on "prisoners' rights," the Court in *Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), observed:

These two principles [an inmate's retention of at least some constitutional rights and deference to prison authorities' administrative decisions] apply in *all cases* in which a prisoner asserts that a prison regulation violates the Constitution, not just those in which the prisoner invokes the First Amendment. We made it quite clear that the standard of review we adopted in *Turner* applies to *all circumstances* in which the needs of prison administration implicate constitutional rights.

*Id.* 494 U.S. at 224, 110 S.Ct. at 1038 (emphasis added). Although *Harper* dealt with a due process issue, *id.* at 213, 110 S.Ct. at 1032, the language employed by the Court suggests a broader application. That is true even though, in each of the Supreme Court cases in which the deferential standard has been applied, the question before the Court dealt only with a regulation which applied to *all* inmates even though it may have affected certain inmates differently. The legitimate penological interest standard has not explicitly been applied by the Supreme Court in an equal protection case although other courts have applied *Turner* and *O'Lone* in evaluating the equal protection claims of inmates. *See Benjamin v. Coughlin,* 905 F.2d 571, 575 (2d Cir.1990); *Kahey v. Jones,* 836 F.2d 948, 950 *et seq.* (5th Cir.1988).

■ As made clear by the Supreme Court in *Jones,* prison administrators have "wide latitude" to treat inmate groups differently unless it is clear that the two groups are so similar as to make the differing treatment an abuse of discretion. However, they cannot appropriately exercise their discretionary powers unless they do so in conformance with *Turner/O'Lone* standards. As the Second Circuit has stated:

While the *Turner/[O'Lone]* standard was established in the context of first amendment issues, it is also relevant to the assessment of equal protection claims in the prison setting. As to such claims, the reasonableness of the prison rules and policies must be examined to determine whether distinctions made between religious groups in prison are reasonably related to legitimate penological interests. We must determine whether "the ...

groups are so similar that discretion has been abused."

*Benjamin v. Coughlin,* 905 F.2d at 575 (quoting *Jones,* 433 U.S. at 136, 97 S.Ct. at 2543).

In the instant case there is an additional hurdle which plaintiffs must surmount in order to prove themselves entitled to either equitable or monetary relief. In *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), and *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the Supreme Court required plaintiffs seeking redress for alleged equal protection violations to show evidence of a "discriminatory purpose" underlying the challenged rule or regulation. In *Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), Justice Powell wrote that *"Davis* does not require a plaintiff to prove that the challenged action rested *solely* on racially discriminatory purposes ... or even that a particular purpose was the 'dominant' or 'primary' one." *Id.* 429 U.S. at 265, 97 S.Ct. at 563. Rather, all that is required for a finding of unconstitutional conduct is "proof that *a* discriminatory purpose has been a motivating factor in the decision." *Id.* at 265–66, 97 S.Ct. at 563 (emphasis added).

In *Feeney, supra,* Justice Stewart, writing for the majority, addressed the issue of discriminatory intent in the context of alleged statutory gender discrimination. In so doing, the Justice stated: "If the impact of this statute could not be plausibly explained on a neutral ground, impact itself would signal that the real classification made by the law was in fact not neutral." *Feeney,* 442 U.S. at 275, 99 S.Ct. at 2294. After concluding that "this is not a law that can plausibly be explained only as a gender-based classification," Justice Stewart wrote:

> Just as there are cases in which impact alone can unmask an invidious classification, cf. *Yick Wo v. Hopkins,* 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220], there are others, in which—notwithstanding impact—the legitimate noninvidious purposes of a law cannot be missed. This is one.

*Id.*

Subsequently, in his opinion, the Justice commented:

The appellee's ultimate argument rests upon the presumption, common to the criminal and civil law, that a person intends the natural and foreseeable consequences of his voluntary actions....

....

"Discriminatory purpose," however, implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

*Id.* at 278–279, 99 S.Ct. at 2295–96 (citations and notes omitted). The Justice went on to note that "[p]roof of discriminatory intent must necessarily usually rely on objective factors.... The inquiry is practical. What a legislature or any official entity is 'up to' may be plain from the results its actions achieve, or the results they avoid. Often it is made clear from what has been called, in a different context, 'the give and take of the situation.'" *Id.* at 279 n. 24, 99 S.Ct. at 2296 n. 24 (citation omitted). Moreover,

> in this inquiry—made as it is under the Constitution—an inference is a working tool not a synonym for proof. When as here, the impact is essentially an unavoidable consequence of a legislative policy that has in itself always been deemed to be legitimate, and when, as here, the statutory history and all of the available evidence affirmatively demonstrates the opposite, the inference simply fails to ripen into proof.

*Id.* at 279 n. 25, 99 S.Ct. at 2296 n. 25.

█ Plaintiffs contend, however, that the discriminatory intent requirement of *Washington v. Davis* and *Feeney* has been displaced, in the context of prisoners' equal protection claims, by the inquiry mandated by *Jones, Turner,* and *O'Lone.* In other words, plaintiffs argue that, in that limited context, the Supreme Court has dispensed with the requirement of discriminatory intent and that the only appropriate inquiry concerns whether "the ... groups are so similarly situated that discretion has been

abused." That position does not withstand analysis. The Court's decision in *Turner* may appropriately be viewed as an articulation of a standard implicit in earlier cases, including *Jones*. "If *Pell* [*v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974)], *Jones*, and *Bell* [*v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)] have not already resolved the question posed in *Martinez*, we resolve it now: *when a prison regulation impinges on inmates' constitutional rights*, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89, 107 S.Ct. at 2261 (emphasis added). Unless, therefore, plaintiffs can show that the challenged regulation impinges on a constitutional right—which in an equal protection setting requires a showing of discriminatory intent—the *Turner/O'Lone* reasonable relation to legitimate penological interest test is not properly invoked. Rather than taking the place of the showing required of a plaintiff with an equal protection claim, *Turner*, *Jones*, and *O'Lone* represent a further requirement for the inmate plaintiff alleging an equal protection violation. That view accords with the reality that inmates enjoy a lesser quantum of constitutional rights than do other members of society.[2]

## RELIGIOUS DIET

■ In the case at bar, plaintiffs have failed entirely to adduce or proffer evidence of any discriminatory purpose on the part of defendants with relation to the religious diet issues. That is true with regard to the previous diet difference between Moslems and Jews, and to the diet distinction presently existing between Moslems and Christians. Having, therefore, failed to make out a prima facie case of intentional discrimination, plaintiffs are not entitled to prevail upon their religious diet equal protection claims.

■ Further, as discussed *supra*, even were that hurdle safely surmounted, plaintiffs' contentions would not survive scrutiny under *Turner* and *O'Lone*. Defendants are currently under a mandate to provide Islamic inmates with a nutritionally adequate pork-free diet. The plan now in place satisfies

that requirement. As indicated earlier, Magistrate Judge Smalkin recommended that that requirement not be extended to include provision of ritually slaughtered meats, based in part upon the prohibitive cost which existed in 1979.

A number of courts have addressed inmates' claims that prison dietary regulations unconstitutionally infringe upon the free exercise of their religious beliefs. Generally speaking, those cases do not present Equal Protection challenges but, rather, present substantive due process challenges, as did *Turner* and *O'Lone*. However, in *Benjamin v. Coughlin, supra*, the Second Circuit considered a case in which Rastafarian inmates brought suit alleging a violation of the Free Exercise Clause and violation of their rights to Equal Protection. The inmates asserted that prison regulations which prohibited them from wearing crowns (Rastafarian religious headgear) but permitted other inmates to wear yarmulkes and kufis violated the Equal Protection Clause. The Second Circuit noted that crowns were much larger than either yarmulkes or kufis and "[w]hile security problems may exist with respect to yarmulkes and kufis, defendants maintain that a heightened security concern is posed by crowns, because of the ... ease with which contraband can be secreted. Here legitimate security interests have been raised by the prison authorities, who must be accorded great deference in these matters." *Benjamin*, 905 F.2d at 579.

In addition to the "crown" issue, the Second Circuit addressed the Rastafarian plaintiffs' claim that provision of religious diets to Muslims and Jews, but not to Rastafarians violated the Equal Protection Clause. The court did not reach the merits of that issue, because, "[b]ased on the present state of the record, ... plaintiffs have failed to clearly define the claim or to make the evidentiary showing required to establish any constitutional dietary claim." *Id.* at 580. The court did note, however, in passing, that "[c]ourts ... are reluctant to grant dietary requests

**2.** *See Soldal v. Cook County*, —— U.S. ——, ——, 113 S.Ct. 538, 545, 121 L.Ed.2d 450, 461 (1992) ("Whatever else [*Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984),] held, it is of limited usefulness outside the prison context with respect to the coverage of the Fourth Amendment.").

where the cost is prohibitive, or the accommodation is administratively unfeasible." *Id.* at 579 (citations omitted).

Indeed, one of the elements of the *Turner/O'Lone* standards for determining reasonableness of a regulation, i.e., whether it promotes a legitimate penological interest, is the effect which accommodation of an inmate's request would have upon other inmates and upon prison resources generally. The Seventh Circuit in *Al–Alamin v. Gramley,* 926 F.2d 680 (7th Cir.1991), wrote that "[b]oth security and economic concerns are legitimate penological concerns. Prison administrators, like most government officials have limited resources to provide the services they are called upon to administer." *Id.* at 686. The court went on to observe:

Within these constraints, the prison must afford all inmates a reasonable opportunity to practice their religion. In providing this opportunity, the efforts of prison administrators, when assessed in their totality, must be evenhanded. Prisons cannot discriminate against a particular religion.... Of course, economic, and, at times security constraints may require that the needs of inmates adhering to one faith be accommodated differently from those adhering to another. Nevertheless, the treatment of all inmates must be qualitatively comparable.

*Id.*

In *Martinelli v. Dugger,* 817 F.2d 1499 (11th Cir.1987), decided the same day as the Supreme Court handed down its opinion in *Turner,* the Eleventh Circuit considered an inmate's challenge to a prison practice of refusing his requests for a completely kosher diet. Because the *Turner/O'Lone* standards had not yet been formulated, the Eleventh Circuit in *Martinelli* employed a two-step approach in addressing the inmate's free exercise claim. The court first determined "whether the prisoner [was] sincere in his or her asserted religious beliefs." *Id.* at 1503. Once the religious beliefs had been determined to be sincere, the court "assess[ed] the validity of the prison practice under the 'least restrictive means' test." *Id.* at 1505 (quoting *Shabazz v. Barnauskas,* 790 F.2d 1536, 1539 (11th Cir.1986)). The Eleventh Circuit, quoting from an earlier Eleventh Circuit decision, noted:

First, the prison regulation must further a substantial government interest. A regulation will be taken to further such an interest if it is rationally related to it. Second, a regulation's restriction ... must be no greater than necessary to protect the governmental interest involved. This two-part standard should be applied with a wide-ranging deference to the expert judgment of prison administrators.

*Id.* 817 F.2d at 1506 (quoting *Bradbury v. Wainwright,* 718 F.2d 1538, 1543 (11th Cir. 1983)). Applying that approach, the court determined the religious diet regulations to be rationally related to a substantial governmental interest—avoiding prison budget overruns—"Florida's prison dietary rules are rationally related to the goal of avoiding excessive administrative expense." *Id.* 817 F.2d at 150 (footnotes omitted). In exploring the evidence on the record before it, the court stated:

[The challenged prison regulation] requires that Florida correctional institutions provide religious diets that are sufficient to sustain the inmates except in "unusual cases," such as where doing so would require excessive budgeting allowances. Our prior cases suggest that the prison administrators' judgments as to what religious diets are too expensive are entitled to some level of deference. We need not, however, decide the continued vitality of these cases because uncontroverted testimony of [prison administrators] indicated that DCI administrators investigated the possibility of providing a full kosher diet alternative for inmates [and found that the cost would be beyond the institution's authorized budget]. This uncontroverted testimony indicates that DCI's refusal to provide Martinelli a full kosher diet was rationally related to its legitimate interest in avoiding cost overruns.

*Id.* at n. 29.

In *Kahey v. Jones, supra,* the Fifth Circuit denied an inmate's claim that the failure of the prison to provide her with a "specially-tailored menu in a special way to accommodate her practice of Islam" constituted a

First Amendment violation. *Id.*, 836 F.2d at 949. The court referred to an earlier case in which the Fifth Circuit had

> ruled that prisons need not respond to particularized religious dietary requests. The principal basis for decision in [*Udey v. Kastner*, 805 F.2d 1218 (5th Cir.1986) ] was the court's recognition that if one such dietary request is granted, similar demands will proliferate, with two possible results: either accommodation of such demands will place an undue burden on the prison system, or the prisons would become entangled with religion while drawing fine and searching distinctions among various free-exercise claimants. *Udey* controls our decision.

*Id.* 836 F.2d at 950 (footnote omitted).[3]

Application of the *Turner/O'Lone* analysis to the claims of plaintiffs in the within case leads to the conclusion that plaintiffs are not entitled to either equitable or monetary relief. With regard to the now-discontinued practice of providing kosher meals for Jewish prisoners while not providing special meals to Moslems other than the generally available pork-free diet, the relative size of the two groups (two Orthodox Jews; approximately one hundred Muslims) during the period in which kosher meals were provided to those Jewish inmates who desired them supports the willingness of the prison administration to incur *de minimis* costs to provide kosher meals and their reluctance to incur the substantial costs of providing comparable meals to the Moslems. With regard to the current system under which inmates are permitted to choose between a pork-free diet and a lacto-ovo-vegetarian diet, the difference in cost between that system and one in which ritually slaughtered meat would be provided for Moslem inmates who desire it is significant and justifies the decision not to provide the latter type of diet. Moreover, the two-tier diet plan presently in force permits the prison administration both to satisfy the special dietary needs of prisoners and to enjoy the administrative and cost advantages of mass production of food.

Plaintiffs have suggested, as one possible alternative, that only a lacto-ovo-vegetarian diet be provided for all inmates. While plaintiffs are likely correct in their assertion that cost would not be an objection to that suggestion, and while cost savings might even be achieved, the effect upon inmate morale of imposing such a diet upon all prisoners would almost surely be negative and could lead to unrest and resentment. Accordingly, the prison administration, in not choosing that course, would appear to be furthering legitimate security and administrative objectives.

Thus, in sum, plaintiffs' challenge to the Jewish–Moslem and to the Christian–Moslem diet differences, fail on *Turner/O'Lone* standards as well as under *Washington v. Davis.* As to plaintiffs' claims for monetary damages, they founder also in the face of defendants' affirmative defense of qualified immunity. That is so, because, under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and its progeny, the uncertain applicability of law to the facts of record in this case with respect to the religious diet issues discussed *supra* entitles defendants to qualified immunity. Accordingly, summary judgment as to those issues will be granted for defendants in a separate Order of even date herewith.

### A–Building

■ A–Building houses the Islamic chapel and the offices of the Islamic Coordinator.[4]

---

**3.** As to possible conflicts between the Free Speech and/or Free Exercise Clauses, and the Establishment Clause, of the First Amendment, see *Lamb's Chapel v. Center Moriches Union Free School District,* — U.S. —, —, 113 S.Ct. 2141, —, 124 L.Ed.2d 352 (1993) (discussed *infra* at n. 9); *Widmar v. Vincent,* 454 U.S. 263, 271, 102 S.Ct. 269, 275, 70 L.Ed.2d 440 (1981); *School District of Abington Township v. Schempp,* 374 U.S. 203, 296–98, 83 S.Ct. 1560, 1610–11, 10 L.Ed.2d 844 (1963) (Brennan, J. concurring).

**4.** Apparently, at some point after 1979, when the consent decree became effective, the prison administration moved the Islamic Chapel to A Building. Plaintiffs object to that substitution as a violation of the Decree. Even assuming, *arguendo* only, that defendants did not appropriately exercise their discretion in that regard and did technically violate the decree by not seeking an amendment by this Court to the latter, the violation is so *de minimis* that this Court hereby amends the decree to cover the change, *nunc pro tunc,* as of the date it occurred.

On October 18, 1990, the prison administration revised A–Building's schedule, limiting its availability for Moslem religious services and activities. The new scheduled hours of operation became Mondays through Thursdays from 8:00 a.m. to 4:00 p.m., Fridays from 8:00 a.m. to 12:00 a.m., and Sundays from 7:00 p.m. to 9:30 p.m. A–Building is closed on Saturdays. There is evidence in the record to suggest that A–Building's actual hours of operation are even more limited than those provided for in the revised schedule. Ronald Thomas–Bey, a member of the plaintiff class, asserts in an affidavit that on Fridays A–Building is in fact open only from 8:00 a.m. until 2:45 p.m., and again from 7:00 p.m. until 9:30 p.m. Given the summary judgment status of the within case, this Court will assume that A–Building's Friday hours are so limited. Prior to October 18, 1990, A–Building was, apparently, open at all times.

Defendants take the position that the Penitentiary reduced the hours of A–Building's operation in response to budgetary constraints upon available manpower. Due to restrictions upon the use of overtime to fill staff positions, the prison became unable to allocate the additional staff needed to open A–Building without compromising security.

Plaintiffs maintain that that reduction violates their constitutional rights and also violates the Consent Decree, because the latter requires the Penitentiary to establish an Islamic Chapel and an office for the use of the Islamic coordinator. The Islamic Chapel was to be made available to the inmates for a weekly Islamic prayer service between 1:00 p.m. and 3:00 p.m. on Fridays. The consent decree further provides that "[a]dditional and/or alternative Islamic activities may be held at the Islamic Chapel provided that prior approval is obtained by the Islamic Coordinator from the Warden or his designated representative."[5] However, the decree states that access to the Chapel may be limited whenever "institutional security would be endangered or when such use would unduly interfere with institutional operations."[6]

Plaintiffs complain that the new schedule makes no provision for Saturday services. They contend that the Consent Decree requires that A–Building be made available to the inmates to hold community prayers every day. This Court does not so interpret the Consent Decree. The Decree provides that "Islamic inmates shall have the right to observe the daily prayer requirements of the Islamic religion without unreasonable restriction, interference, or harassment...."[7] Moslem inmates are permitted, under the terms of the Decree, to congregate, to the extent consistent with institutional security and the constraints imposed by the space available, for prayers in the office of the Islamic Coordinator during their Recreation or Free Time. However, the Decree specifically provides that, "[a]t no time shall daily prayers by the Plaintiffs unreasonably interfere with institutional operations."[8] In view of the aforementioned budgetary limitations upon available manpower at the Penitentiary, opening A–Building on Saturdays to accommodate plaintiffs' desire to hold congregate prayer services, would so "interfere with institutional operations." Accordingly, this Court hereby determines that neither the present schedule for use of A–Building nor what plaintiffs assert is the schedule of actual operation violates the Consent Decree.

Having so determined, this Court must now reach the question of whether the change in A–Building's schedule violates any right secured to plaintiffs under the Constitution. Even assuming, *arguendo*, that plaintiffs are able to show that the new schedule "impinges on [a] constitutional right[ ]," it would nevertheless pass constitutional muster under *Turner* and *O'Lone*. As discussed in detail in the preceding section of this Opinion, the *Turner/O'Lone* test provides that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner,*

5. Amended Partial Settlement Agreement dated July 16, 1979, at p. 5.

6. *Id.* at pp. 4–5.

7. *Id.* at pp. 5–6.

8. *Id.* at p. 5.

482 U.S. at 89, 107 S.Ct. at 2261. In the instant case, the aforementioned budgetary and manpower constraints provide ample justification for the change in schedule. Accordingly, in the aforementioned separate Order of even date herewith, this Court will grant defendants' motion for summary judgment as to the issues in this case relating to the operation of A–Building.

### Founder's Day

Founder's Day commemorates the birth of the founder of the Moorish Science Temple of America. The holiday is observed every January 8th. On that day members of the sect congregate for prayer and ceremony. Inmates who adhere to the Moorish Science Temple want the prison administration to permit families and persons from outside of the prison to be able to attend the Founder's Day celebration. Prison officials permit inmates to observe Founder's Day, but do not allow the celebration to include outside guests because of institutional safety and cost concerns.

There is some dispute as to whether and to what extent outsiders have visited the Penitentiary to join in the celebration of Founder's Day. Plaintiffs maintain that "there is a long tradition of allowing the public to attend Founder's Day celebration." The prison administration, on the other hand, claims that there has been no tradition of allowing outsiders to attend the celebration. Thus, the warden of the Penitentiary has stated in his affidavit that, "[1990] was the first time that persons from outside the institution attended the event." Further, defendants contend that the 1990 Founder's day celebration was secular in nature because outsiders were charged a fee to attend the celebration and the Moorish Science Temple made a profit. Plaintiffs deny this, maintaining that what defendants call "fees" were donations intended to help defray the costs of the celebration. This Court will assume, for purposes of this decision, that the Founder's Day celebration is, as plaintiffs maintain, a purely religious holiday and that in 1990, its observance at the Penitentiary was of a purely religious nature.

Even assuming, however, that the Founder's Day celebration is religious in nature, and was observed as such at the institution in 1990, not permitting outsiders to attend does not violate the terms of the Consent Decree or any of plaintiffs' constitutional rights. The Consent Decree states that, "[t]he Islamic Coordinator shall advise the Defendants with respect to Islamic holidays and, upon the direction of the Islamic Coordinator, the Islamic inmates shall be allowed to observe the holiday of Ramadan, and other Islamic holidays and holy days, consistent with institutional operations." Inmates are permitted to celebrate Founder's Day. They are simply not permitted to invite outsiders to attend. Nowhere does the Consent Decree grant Plaintiffs that right. Plaintiffs seemingly do not contend that their religion requires the participation of outsiders at Founder's Day. However, even if the attendance of outsiders were essential to the observance of Founder's Day, in view of cost and security concerns, defendants are on sound ground in not permitting them to attend because in the view of defendants, such attendance would not be "consistent with institutional operations."

Plaintiffs further contend, however, that, in view of the prison's practices with regard to permitting outsiders to attend other prison functions, allegedly both religious and secular in nature, refusing to permit outsiders to attend the Founder's Day celebration violates plaintiffs' Equal Protection rights. The institutional policy currently in effect permits certain secular self-help and/or charitable organizations within the prison (e.g. Alcoholics Anonymous, Jaycees) to bring outsiders in to celebrate the group's accomplishments once a year. Not all secular groups are permitted to invite guests to an annual event. Rather, they must be granted permission by the warden, who apparently evaluates such requests on an *ad hoc* basis, taking into account the nature and function of the requesting group and its contribution toward the accomplishment of the objectives of the Penitentiary. Under the present policy, no religious group is permitted to have outsiders attend any events.

Plaintiffs contend that the prison's policy of permitting certain secular groups to invite guests to one event each year while not affording to religious groups the same privilege, impermissibly discriminates against religion. Defendants assert that those groups, i.e. Alcoholics Anonymous and the N.A.A.C.P., "serve important rehabilitative functions," and that Maryland's Department of Corrections has concluded that allowing, at the Warden's discretion, annual banquets to be attended by outside guests rewards inmate participation in such self-help groups and serves as an incentive for inmates to participate in such groups. Defendants note that any visits by outsiders impose costs and create security risks, and that, given the financial and manpower constraints which obtain as to the state prison system, permitting all inmate groups to have similar privileges to invite outsiders would overtax prison resources. Since only members of a limited number of such groups can be permitted to attend such events, the prison administration maintains that it is soundly exercising its discretion to allocate such visits in the manner which best furthers legitimate penological interests. Encouraging inmate participation in such organizations as Alcoholics Anonymous would appear to fall well within the bounds of that discretion.

■ Plaintiffs assert, in response, that they too should be allowed this incentive.

Permitting families and friends to attend religious events may well provide an incentive for inmates to practice religion. However, it is possible to argue that such an incentive could potentially be challenged as violative of the Establishment Clause.[9] But even assuming that that possibility is no bar whatsoever to what plaintiffs seek, still this Court may not, in given instances such as Founder's Day celebrations, "substitute [its] judgment on ... difficult and sensitive matters of institutional administration, for the determination of those charged with the formidable task of running a prison." *O'Lone*, 482 U.S. at 353, 107 S.Ct. at 2406 (citation omitted). In allocating what is, in effect, a scarce resource within the prison system, i.e. the opportunity for inmates to invite outsiders, the defendants must be permitted wide discretion to use that resource in a manner calculated best to effectuate their own reasonable conception of legitimate penological goals. In addition, requiring the prison administration to choose between religious sects, with the value judgments implicit in such choices, differs significantly from choosing between competing secular groups, and would appear to entail a risk of causing resentment and unrest in the prison population among members of sects not selected to invite outside guests. In sum, the rule excluding religious groups from those eligible to hold such functions passes muster under *Turner* and *O'Lone*.

9. See n. 3 *supra*. In its recent decision in *Lamb's Chapel v. Center Moriches Union School District*, — U.S. —, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993), the Supreme Court held that the Free Speech Clause of the First Amendment made applicable to the States by the Fourteenth Amendment "was violated by denying a church access to school premises to exhibit for public viewing and for assertedly religious purposes, a film dealing with family and child-rearing issues faced by parents today." — U.S. at —, 113 S.Ct. at 2144. Plaintiffs assert that the refusal of defendants to consider representatives of *religious groups*, as well as non-religious groups, as possible visitors to the Penitentiary is a denial of equal protection rights of the plaintiffs because certain visitors are excluded solely on the basis of the religious nature of the groups to which they belong, and that such classification and treatment is unreasonable. It could, perhaps, be contended that defendants should be required to evaluate, under *Turner/O'Lone* standards, on an individual case by case basis, each request for admission of visitors, regardless of whether the organization involved is religiously or non-religiously oriented, rather than be permitted automatically to deny the request by applying the "religious" label. But, in the end, defendants would be entitled to exercise *Turner/O'Lone* discretion if they concluded that they could not, without creating undesirable tensions, grant the privilege to visit to representatives of *any* religious group unless they granted that privilege, when requested, to representatives of *all* religions, and that since financial and manpower problems preclude the latter, they could not grant the request as to any one religious group such as the Moslems. For that reason, in this Court's view, *Lamb's Chapel,* in the context of the within prison setting, does not call for any equitable relief in connection with the Founder's Day issue. And, of course, the legal question decided in *Lamb's Chapel* was certainly not one concerning which, prior to that decision, there was sufficient certainty so as to deny to defendants herein their asserted qualified immunity protection from damage claims relating to the Founder's Day issue, under the objective standards of *Harlow v. Fitzgerald, supra,* and its progeny.

■ Plaintiffs contend, however, that the stated policy has not been applied uniformly to all religious groups, and that, in fact, outsiders from certain religious groups have been invited to attend religious functions held in the Penitentiary. Specifically, plaintiffs maintain that "Family Day," which is held on or around December 15 each year and to which family and other guests are invited by inmates, is a thinly-disguised Christmas celebration. Though all inmates may attend, and in fact a number of Moslems apparently so do, plaintiffs claim that that event, which includes "the giving of gifts wrapped in Christmas paper is ... much more meaningful to Christian[ ] inmates than to inmates of other religions, such as the Plaintiffs." Defendants counter that Family Day is wholly secular, that no prayers or religious services are held, and that inmates and outsiders of all religions are invited to, and in fact many do, attend and participate in the celebration. Furthermore, allowing inmates to have contact with and to enjoy time with outside friends and family during the December holiday season—the principal annual holiday season in what is predominantly a Christian country—would seemingly tend to ease tensions within the prison community during a difficult time of year. In that context, one must not lose sight of the fact that the majority of the prison's population are Christian. That, plus the aforementioned strains which events involving outsiders place on prison resources and the resultant limit upon the number of such invitations which can be issued and upon the number of such events which can be held, calls for prison authorities to have wide discretion with respect to the selection of such events in order to effectuate legitimate penological objectives. It is in that context that the distinction between Founder's Day and Family Day passes muster under the *Turner/O'Lone* standards.

■ But plaintiffs advance an additional objection with regard to defendants' handling of religious groups. They point to the now discontinued classification of the group called Gospel Revelations as a secular organization entitled to invite outside guests to prison events. Gospel Revelations is an inmate group which has performed gospel music for audiences of inmates only and of both inmates and outsiders. While not all of its members were Christians, nevertheless, after plaintiffs in the within case complained that Gospel Revelations was in fact a religious group, defendants reexamined its classification as secular, concluded that Gospel Revelations is in fact primarily a religious organization, and withdrew recognition of it as a secular group. Defendants have admitted that the original classification of Gospel Revelations as secular was a mistake. However, there is no evidence in the record to suggest that it was anything but a good faith mistake.

Defendants contend that, in light of their prompt correction of the mistake, plaintiffs' quest for equitable relief in this connection is moot. Plaintiffs assert that such equitable relief should be granted inasmuch as this is a controversy "capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. Interstate Commerce Commission*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). The Supreme Court has noted that a "court's power to grant injunctive relief survives discontinuance of the illegal conduct." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). "The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *Id.* In assessing that danger, "the [court's] discretion is necessarily broad and a strong showing of abuse must be made to reverse it." *Id.* In this case, in view of defendants admission on the record of their error, and their present adherence to a policy recognizing that error, there is, in this Court's view, no need for equitable relief.

■ Nor, in any event, does the mistake constitute a basis for any relief under 42 U.S.C. § 1983. To begin with, as the Supreme Court has stated in *Cruz*, 405 U.S. at 322 n. 3, 92 S.Ct. at 1081 n. 3, "every religious sect or group" need not "have identical facilities or personnel." While the Supreme Court used those words in relationship to a small as opposed to a rather large religious group, that approach suggests that even a sizable religious group such as plaintiffs can-

not justifiably complain if there is a minor-type violation of their equal protection rights by a good faith error such as occurred with respect to Gospel Revelations. Moreover, there is no indication in the record that in permitting outsiders to be invited by inmates to attend any Gospel Revelations performances, defendants intended to discriminate against Moslems or against any other religious group. Thus, plaintiffs' quest in that regard for any relief—either for equitable relief or for monetary damages—fails in the face of the "discriminatory purpose" requirement of *Washington v. Davis, supra.*[10]

## CONCLUSION

Accordingly, in a separate Order of even date herewith, this Court will enter summary judgment for defendants.[11]

## ORDER

Summary judgment is hereby entered in favor of defendants in connection with each and all claims of plaintiffs. It is so OR-DERED.

---

10. *See* the discussion *supra* at pp. 858–59.

11. This Court is most appreciative of the prolonged and excellent representation of plaintiffs by counsel for plaintiffs who accepted a *pro bono* assignment in this case.